**In re Irvin FOSTER, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 90–671.**

District of Columbia Court of Appeals.

Submitted Sept. 18, 1990.

Decided Oct. 24, 1990.

Before STEADMAN, FARRELL and WAGNER, Associate Judges.

PER CURIAM:

Finding violations by respondent of DR 6–101(A)(3) (neglect), DR 7–101(A)(1) (intentional failure to seek a client's lawful objectives), and DR 7–102(A)(2) (intentional failure to carry out a contract of employment),[1] the Board of Professional Responsibility (the Board) has recommended that respondent be suspended from the practice of law for thirty days. We accept[2] the Board's findings, conclusions, and recommendation as set forth in its report which we reproduce in an appendix hereto.

Accordingly, we order that respondent, Irvin P. Foster, be suspended from the practice of law in the District of Columbia for a period of thirty days, effective thirty days from the date of this order.

*So ordered.*

APPENDIX

DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:

IRVIN P. FOSTER,

Petitioner.

Bar Docket No. 428–88

REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

On April 28, 1989, Bar Counsel charged Foster with violating DR 6–101(A)(3) (neglect); DR 7–101(A)(1) (intentional failure to seek his client's lawful objectives); DR

---

1. The Hearing Committee also found a violation of DR 9–103(B)(4) (failure to promptly return client's property after request). Evaluating the record, the Board determined that it was insufficient to show a violation by the requisite "clear and convincing evidence," a conclusion with which we take no issue. Board on Professional Responsibility Internal Rule 13.6 (April 2, 1988); *Matter of Thorup*, 432 A.2d 1221, 1225 (D.C. 1981).

2. Respondent has taken no part in these proceedings before the Board or before us. In a response to the proposed findings of fact and recommendation of bar counsel to the Hearing Committee, respondent acknowledged that his conduct was "unexcusable" but asserted that in light of his stroke and his duty to other clients, the proposed sanction was "more severe than merited."

7–102(A)(2) (intentional failure to carry out a contract of employment); and DR 9–103(B)(4) (failure to promptly return client's property after request). Hearing Committee Number One held hearings on July 20, 1989, and issued its report on November 7, 1989, concluding that Foster committed the charged violations and recommending that Foster be suspended for 30 days.

The Board has reviewed the record in this case and adopts the Hearing Committee's conclusions with the exception of its conclusion that Foster violated DR 9–103(B)(4). The Board agrees with the Hearing Committee's recommended sanction.

### FACTS

In early October 1987, Ms. Gladys Waters retained Foster to represent her in collecting child support from her former husband. At that time, she paid a retainer of $250 and gave Foster some financial information and original documents pertaining to the case, such as the judgment and the order of dissolution of the marriage. She also gave Foster the address and telephone number of her former husband.

Ms. Waters next spoke with Foster by telephone in November 1987. At that time, he informed her that he had written to someone in Chicago to get other documents in the case and that he would contact her when he had received them. (The Hearing Committee found that there was no evidence that Foster wrote a letter to anyone in Chicago for Ms. Waters.)

Over the next few months, Ms. Waters periodically called Respondent and left messages on his answering machine. On February 16, 1988, Respondent suffered a stroke and was hospitalized for three weeks. He was advised that he "would not be able to work for a substantial period of time and would have limited energy when (he) returned to work." He began to work on a reduced schedule in May 1988. He never informed Ms. Waters of his stroke or that he needed to take time off to recuperate.

Ms. Waters learned of the attorney's illness and that he had resumed practice in April or May, 1988, when she again tried to contact him. She found out that his phone had been disconnected, but was able, with difficulty, to get his home address and new number from one of Foster's other clients. Sometime in July 1988, she left a message on an answering machine at Foster's new number.

Foster returned her call in August 1988, leaving a message on her answering machine. She returned the call at 6 p.m. that evening, at which time Foster told her that he was having dinner and said that he would call back. Ms. Waters said that she would be at home after 10 p.m. There was no message on her answering machine when she got home.

From August to the beginning of November 1988, Ms. Waters repeatedly tried to reach Foster. She left messages on his answering machine, wrote to him and enlisted an attorney friend to help her contact Foster. The attorney put a letter in Foster's box at the courthouse and spoke with him personally about Ms. Waters' concerns.

On October 11, 1988, Ms. Waters sent a letter by certified mail to Foster. She discussed the history of his representation and requested "that you return all of my papers immediately and the entire amount of my retainer." She further stated in her letter: "if I do not hear from you by October 20, 1988, I will have no choice but to seek other measures of recouping my papers and funds." Because Foster never claimed the letter, it was returned to Ms. Waters.

During October, Ms. Waters called Foster three times. On October 12, 1988, she left a message on his answering machine, again requesting that he return her papers. Nearly a month later—on November 2, 1988—Ms. Waters reached Foster by telephone and asked why he had not returned her files. He claimed to have mailed them on October 20, 1988, and said that he had a "meter" tape. When Ms. Waters stressed that she needed her file, Foster said that he

would "try and get the post office to trace it." Ms. Waters informed him that she would give him until the middle of November 1988 to return her papers and money.

Having heard nothing further from Foster, Ms. Waters filed a complaint on December 7, 1988. Three months later, in response to Bar Counsel's subpoena, Foster submitted his file of Ms. Waters' case with his reply to Bar Counsel. He also refunded the retainer fee. Ms. Waters never received the original of the documents that she had given Foster.

## VIOLATIONS

### DR 6–101(A)(3)—Neglect

The Hearing Committee concluded that the record clearly and convincingly established that Foster engaged in neglect. The Board agrees with this conclusion.

From the beginning of his representation of Ms. Waters in October 1987 until she filed her complaint against him a year and two months later, Foster ignored his obligations as an attorney to Ms. Waters. Though he told her that he had written a letter to someone in Chicago to obtain information for the case, there is no evidence in the file substantiating his claim. Even if we disregard the period when Foster suffered and then recovered from his stroke—a period of four months—he did nothing on behalf of Ms. Waters before and after his stroke.

Foster's conduct demonstrates neglect, *i.e.*, a conscious disregard for the responsibility he owed to Ms. Waters and a consistent failure to carry out his obligations to her. See *In re Reback*, 487 A.2d 235 (D.C. 1985), affirmed in relevant part, 513 A.2d 226 (D.C.1986) (*en banc*).

### DR 7–101(A)(1)—Intentional Failure to Seek a Client's Lawful Objectives

### DR 7–101(A)(2)—Intentional Failure to Carry Out a Contract of Employment

The Hearing Committee concluded, and the Board agrees, that Foster's conduct violated these rules. For over a year Foster was under an obligation to prosecute

Ms. Waters' case. For approximately four months before his stroke and four to five months after his recovery, Foster did no work for Ms. Waters despite the payment she had made and her many telephone inquiries. Nor did he pursue her case after being spoken to by another attorney. When he had to reduce his work for a period of time because he was recovering from his stroke, he had an obligation to inform his client of his situation and, perhaps, to withdraw from the case. He did neither.

In *In re Reback, supra,* 487 A.2d at 240, the Court defined an intentional failure violation as the following:

> Our opinions show that attorneys will be held not only to have been neglectful but also to have intentionally failed to seek the client's lawful objectives if the attorneys were demonstrably aware of the neglect or if their neglect was so pervasive that they must have been aware of it.

In this case, there is no doubt that Foster knew of his obligations to Ms. Waters and intentionally disregarded them for over a year. That is a sufficient period to demonstrate both that he was aware of his neglect and that such neglect was pervasive neglect. Accordingly, violations of DR 7–101(A)(1) and (2) have been established.

### DR 9–103(B)(4)—Failure to Return Client Files

The Hearing Committee concluded that Bar Counsel established by clear and convincing evidence that Foster violated DR 9–103(B)(4). The Board evaluates the evidence differently.

On October 12, 1988, Ms. Waters left a message on his answering machine requesting that Foster return her documents. Almost a month later, on November 2, Ms. Waters reached Mr. Foster on the telephone and he told her that he had mailed her file to her on October 20, 1988. She never received his package. There is a meter tape in the client file with that date on it; however, there is no evidence that Foster tried to trace the package through the post office as he said he would. It was not until March 2, 1989, in response to Bar

Counsel's subpoena, that Foster produced his file for Ms. Waters. This did not, however, have the original documents in it.

The record reflects that Ms. Waters requested return of her documents and that she never received them. Foster told Ms. Waters he mailed the documents on October 20, 1988, and he referred to a meter tape to support his assertion. The file that Respondent produced in response to Bar Counsel's subpoena included a meter tape dated October 20, 1988. In our view, if Respondent mailed the documents to Ms. Waters he discharged his obligation under DR 9–103(B)(4). Although the question is a close one, we believe that the record in this case is insufficient to sustain a finding, by clear and convincing evidence, that Respondent did not mail the documents to Ms. Waters. *See* Board Rules 11.4, 13.6. Accordingly, the Board concludes that a violation of DR 9–103(B)(4) has not been established.

## SANCTION

Bar Counsel has recommended a suspension of 30 days. Foster acknowledges the seriousness of his conduct, but urges that a 30–day suspension is more severe than warranted. He also points out in his brief that his other clients would suffer a hardship should he be suspended. In the context of this case, Respondent's professed concern for his other client's welfare lacks persuasiveness, particularly since he showed no such compassion for Ms. Waters. Quite the contrary, he ignored his obligations to her for over a year.

The Board must take into account a number of factors before determining the appropriate sanction, namely, seriousness of the neglect, prejudice to the client, violation of other disciplinary rules, dishonest conduct, prior discipline, respondent's attitude toward the violations and circumstances in mitigation. In this particular case, Foster's failure to do anything on behalf of his client for a year constitutes serious neglect.

While Ms. Waters may not have suffered actual harm as a result of Foster's misconduct, her receipt of the outstanding $17,000 her husband owed her in child support could have been delayed a year, which certainly could have caused great inconvenience and financial hardship. She also had to go to considerable lengths to contact the attorney and get copies of her original documents which she never received.

Foster's neglect was so pervasive that it rose to the level of a violation of DR 7–101(A)(1) and (2).

Although Foster did violate these rules of professional conduct, he was not found to have violated any disciplinary rule relating to dishonesty. He has been previously disciplined—publicly censured—in September 1984 for his conduct in two cases. He failed to appear for trial, causing his civil suits to be dismissed, and then failed to communicate to his clients.

Foster's brief indicates his recognition of the seriousness of his current disciplinary violations. With regard to mitigation, both the Hearing Committee and Bar Counsel have alluded to Foster's stroke. Though he was not so incapacitated that he was incapable of withdrawing or communicating with Ms. Waters—something he clearly should have done—his practice was affected by his hospitalization and his recovery.

The Board concurs with the 30–day suspension recommended by Bar Counsel and the Hearing Committee. This period of suspension has been recommended for comparable misconduct by other attorneys. For example, in *In re Fitzgerald*, an attorney was suspended for 30 days for violating DR 1–102(A)(5) and DR 6–101(A)(3) for failing to appear in court and failing to tell the court why he could not appear in nine separate cases. He failed to respond to three letters of inquiry from Bar Counsel about his absences from court and had previously been reprimanded by the Board. Like Foster, Fitzgerald had health problems during the period of his representation.

In *In re Dory*, 528 A.2d 1247 (D.C.1987), an attorney was found to have violated DR 7–101(A)(1) and (A)(2) for not doing any-

thing on behalf of his client after filing initial pleadings in a probate case. He was suspended for 30 days. Dory was then suspended for an additional 30 days for neglecting another client at the same time as the first neglect. *In re Dory*, 552 A.2d 518 (D.C.1989). During this period he was suffering from stress.

Though Foster's misconduct is serious, it is less serious than the even more pervasive neglect which was held to warrant a 60–day suspension in *In re Santana*, D.N. 304–88, *et al* (B.P.R. January 26, 1990). In *Santana*, the respondent had neglected two clients, did minimal work and was not available at all to the clients.

The Board believes that a 30–day suspension is appropriate in this case. It is a suitable sanction to emphasize that when a lawyer agrees to take a client's case he must diligently represent that client. Should circumstances prevent him from doing so, he must explain his situation to his client and, if necessary, withdraw from the case.

Accordingly, the Board recommends to the District of Columbia Court of Appeals that Respondent be suspended from the practice of law for 30 days.

BOARD ON PROFESSIONAL
 RESPONSIBILITY

By: Hannah Jopling Kaiser

Date: March 22, 1990

All members of the Board concur in this report and recommendation, except Mr. Carter, who did not participate.